**IN THE UNITED STATES DISTRICT COURT**
**FOR THE MIDDLE DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| **ELAINE R. MCKISSICK, in her** | : | |
| **own right, and as Administratrix of** | : | |
| **the Estate of TROY ALLEN COLE,:** | | **Civil Action No. 1:09-CV-1840** |
| | : | |
| **Plaintiff,** | : | |
| | : | |
| **v.** | : | **(Magistrate Judge Carlson)** |
| | : | |
| **COUNTY OF YORK, et al.,** | : | |
| | : | |
| **Defendants.** | : | |

**MEMORANDUM OPINION**

## I.  INTRODUCTION

On October 7, 2008, Troy Cole entered the York County Prison as a pre-trial detainee.  At that time, Cole was 40 years old and suffered from a host of medical and substance abuse problems, including end-stage renal disease, hepatitis C, hypertension, seizure disorder, and opiate addiction.  During the early morning hours of October 28, 2008, Cole suffered a heart attack at the prison, and subsequently died at a hospital on November 5, 2008, due to complications from hypertensive cardiovascular disease, lack of oxygen to the brain, and bronchopneumonia.

Following Troy Cole's death, Elaine McKissick, Troy Cole's mother and the administratrix of his estate ("Plaintiff"), brought this action in federal court on September 23, 2009.  (Doc. 1)  In her complaint, Plaintiff alleged that medical

providers at the prison were liable for violations of the Eighth and Fourteenth Amendments to the United States Constitution, and for negligence under state law. With respect to these claims, Plaintiff named as Defendants PrimeCare Medical, Inc. and its employees: Michelle Murphy, CMA; B. Hamrick, RN; Kimberly Heim, RN; Michelle Rau, EMT; and Dr. Erik Von Kiel (collectively, the "Medical Defendants").

Additionally, Plaintiff sued the County of York; the York County Board of Inspectors a/k/a York County Prison Board; and Mary E. Sabol, the prison's warden, alleging that these Defendants violated Title II of the Americans with Disabilities Act, 42 U.S.C. §§ 12101 et seq. ("ADA"), by prohibiting Troy Cole from continuing with methadone treatments following his arrival at the prison, and alleging that the deprivation of methadone caused or contributed to his inability to complete his dialysis treatments for end-stage renal disease.

Defendants responded by filing motions to dismiss the complaint (Docs. 12, 17), which the District Court granted in part and denied in part.  (Doc. 40)  In its order, the District Court dismissed Plaintiff's claims against the County of York and Warden Mary Sabol, but permitted all remaining claims against the Medical Defendants and against the York County Prison Board to go forward.  (Id.)

Following a period of discovery, the Medical Defendants and the Prison Board have moved separately for summary judgment on all of Plaintiff's claims.  (Docs. 54,

58)  The motions have been fully briefed and are ripe for disposition.  (Docs. 59, 60, 69, 70, 71, 72, 73, 74, 75)  Upon consideration of the motions and documents filed in support of and opposition thereto, we find that there remain unresolved issues of material fact that preclude summary disposition of Plaintiff's claims against Dr. Von Kiel, Kimberly Heim, RN, and PrimeCare Medical, and that these disputed factual issues necessarily must be resolved by a factfinder at trial.

However, with respect to Plaintiff's claim against the York County Prison Board for alleged violations of Title II of the ADA, we find that Plaintiff has developed insufficient facts to support this claim.  In essence, Plaintiff claims that the prison's policy of prohibiting inmates from continuing to use methadone was itself discriminatory, and that the deprivation of methadone impaired Troy Cole's ability to complete his dialysis treatments.  As discussed below, however, we find that Plaintiff has failed to support this claim with sufficient evidence to survive summary judgment. As an initial matter, we have some doubts that Cole was a "qualified individual" under the ADA, as he admitted to prison officials that he used heroin two days before arriving at the prison, and there is thus some question as to whether Cole was a recovering drug addict who comes within the protections of the ADA.

But even if this is merely a fact question that ordinarily should be resolved by a jury, and we assume that Cole was a qualified individual under the ADA for

purposes of ruling on the motion for summary judgment, Plaintiff's claim nevertheless fails because she has not shown that Cole was discriminated against, as the methadone policy applied to all male inmates at the prison, and because Cole was not denied access to his dialysis treatments.

Even more fundamentally, the record contains insufficient evidence to support Plaintiff's underlying claim that Cole's lack of access to methadone caused or contributed to his inability to complete his dialysis treatments.  Instead, the record presented to the Court contains only the lay, speculative testimony of Plaintiff that her son required methadone to complete dialysis, and a limited reference in one of Cole's treatment notes indicates that Cole claimed he was "wigging out" due to withdrawal symptoms.  Notably, although Plaintiff has provided two expert reports in support of her claims, neither expert opined that Cole's lack of methadone treatment was the, or one of the, reasons that Cole failed to complete his dialysis treatments.  Instead, these experts opined that Cole's diet and uncontrolled hypertension were the contributing and critical reasons for Cole's failed dialysis, and their testimony otherwise focuses almost exclusively on the medical treatment that Cole received at the prison, and particularly on Cole's last day at the prison, when he began a clinical devolution that ended with him suffering a heart attack shortly before 2:00 a.m. on October 28, 2008. Accordingly, we find Plaintiff has failed to support her ADA claim, and the lack of

evidence compels a finding that summary judgment in the Prison Board's favor is warranted.

In sum, we find that Plaintiff has failed to meet her burden on summary judgment of pointing to evidence to support her claim against the Prison Board under Title II of the ADA, and we will, therefore, grant summary judgment in the Prison Board's favor on this claim. However, Plaintiff has demonstrated the existence of disputed issues of material fact relevant to her claims against the Medical Defendants, and these claims will proceed to trial.[1]

## II.   **FACTUAL BACKGROUND**[2]

By the time he was arrested in October 2008 on an outstanding warrant, 40 year-old Troy Cole had been addicted to drugs, including opiates, for approximately 14 years. In addition to his long history of substance abuse, Cole suffered from myriad serious medical problems, including end-stage renal disease, hepatitis C,

---

[1]   In addition, Plaintiff has consented to the dismissal of her claims against Defendants Michelle Murphy, B. Hamrick, Michelle Rau, and Todd Haskins "given their limited roles in the treatment of . . . Troy Cole." (Doc. 73, at 2) Accordingly, the remaining "Medical Defendants" consist of Dr. Erik Von Kiel, Nurse Kimberly Heim, and PrimeCare Medical, Inc.

[2]   The factual background is taken from the parties' statements and counterstatements of material fact (Docs. 56, 60, 71, 72), to the extent it appears there is no genuine dispute about a particular fact. In other instances, we have included factual assertions, supported by record evidence, taken in the light most favorable to Plaintiff as the non-moving party.

hypertension, and seizure disorder.  To treat his end-state renal disease, Cole had been

undergoing dialysis treatments.  In addition, to combat his opiate addiction, Cole was

following a regimen of methadone treatment to control his withdrawal symptoms and

to facilitate therapeutic progress; according to Plaintiff, Cole had been undergoing

methadone treatment for approximately three months before his arrest.  (Doc. 73, Ex.

R, Deposition of Elaine McKissick, at 36)  However, according to the medical intake

form prepared upon Cole's arrival at the prison, Cole admitted to having used three

bags of heroin just two days before his arrest.  (Doc. 73, Ex. G, Medical Intake Form)

Thus, when Cole was processed into the York County Prison on October 7, 2008, he

suffered from grave health and substance-abuse problems – problems that medical

staff at the prison initially seem to have recognized and acted upon.[3]

Thus, because of the manifest nature of his serious medical conditions, upon

being admitted to the prison, Cole was immediately placed in the medical unit at York

County Prison under the care of PrimeCare Medical, Inc., the contractor to which

York County's Prison Board outsources the medical care of inmates at the prison.  It,

therefore, appears beyond dispute that Cole presented to the prison with very serious

---

[3] Notwithstanding his poor health condition, we note that Plaintiff's expert nephrologist opined that the average life expectancy for a man in Cole's condition, assuming proper medical care, was nearly 10 additional years.  (Doc. 69, Ex. L, Report of Dr. Carl Goldstein.)

medical conditions, and that medical officials at the prison initially recognized these conditions and housed Cole accordingly.   (Doc. 73, Ex. G, Initial Medical Assessment)[4]

After his intake, however, the parties dispute whether Cole was, in fact, provided with appropriate and necessary medical care over the following three weeks leading up to his discharge during the early morning hours of October 28, 2008, after he suffered what would prove to be a fatal heart attack while in custody at the prison.

Among her claims, Plaintiff has charged that the Prison Board followed PrimeCare Medical guidelines, which provided that no inmates other than expectant mothers would received methadone treatment while in custody.  Plaintiff claims that the refusal to make methadone available to Cole was discriminatory and caused Troy Cole medical injury by impairing his ability to complete necessary dialysis treatments. As an initial matter, there is no dispute PrimeCare Medical adhered to a policy that refused to continue methadone treatment for inmates other than pregnant women, unless ordered by a court to do so.  Accordingly, following his intake at the prison,

---

[4] This medical intake form reflects that PrimeCare Medical was aware that Cole suffered from renal failure, hepatitis C, and seizure disorder.  (Id.)  In addition, the intake forms shows that Cole acknowledged that he was an intravenous drug user, and that he had used heroin two days prior to being admitted to the prison.  (Id.)  Finally, the intake form reflects that Cole was taking a battery of medications, including methadone. (Id.)

Troy Cole's methadone treatments were abruptly discontinued.   According to Defendants, PrimeCare Medical addresses addicted inmates' withdrawal symptoms with alternative therapies and approaches, although it is not clear from the record what steps were taken in response to Cole's alleged withdrawal symptoms.

The physician in charge of Troy Cole's medical care at the prison was Dr. Erik Von Kiel, an employee of PrimeCare, who first saw Cole on October 17, 2008, ten days after his arrival at the prison.  (Doc. 73, Ex. D, L)  Dr. Von Kiel testified during his deposition that notwithstanding Cole's numerous serious health concerns, if Cole's treatment needs were "closely managed," he could be expected to survive for a "number of years".  (Doc. 73, Ex. D, Deposition of Dr. Erik Von Kiel, at 45) Nevertheless, there are facts in the record to suggest that Cole's medical condition was not "closely managed," and that Cole's serious health problems were, in some instances, either ignored, not taken seriously, or inadequately addressed by Dr. Von Kiel and other medical staff at the prison.

In this regard, the record reveals that Troy Cole suffered what appears to have been a precipitous physical decline during the three weeks he was housed at York County Prison, beginning shortly after his arrival.  Medical records and other documents compiled in this action indicate that during his incarceration, Cole suffered from increased potassium levels, with fluid build-up, high blood pressure, and

8

attendant cardiovascular risks.  (Doc. 73, Ex. D, Von Kiel Dep. at 16-18; Ex. M, at 4) Additionally, on October 12, 2008, less than one week after arriving, Cole suffered a seizure at the prison following several days of elevated blood pressure, requiring that he be hospitalized for two days.  Upon Cole's discharge, doctors expressly prescribed him a low-sodium renal diet.  (Doc. 73, Ex. H)  However, there is evidence in the record that shows Cole was not provided with a low-sodium renal diet at the prison, but was repeatedly provided with foods, such as peanut butter, that are toxic for individuals with end-stage renal disease.

During his incarceration, Cole was receiving dialysis treatments from an outside provider, Wellspan Dialysis.  Records from Wellspan indicate that throughout the period of time Cole was receiving dialysis treatments during his incarceration, he suffered from elevated blood pressure, high potassium levels, and pronounced anxiety related, at least in part, to his withdrawal from opiates and the discontinuance of his methadone treatment. (Doc. 73, Ex. I)  These records also reveal that Cole's final four dialysis treatments were aborted before completion, apparently at Cole's insistence. Included within Cole's treatment notes are observations that Cole's diet and withdrawal from opiates was adversely affecting his ability to complete and benefit from dialysis treatments.

Records from Wellspan indicate that Cole complained during his dialysis treatments that his withdrawal symptoms were adversely affecting his ability to complete his dialysis treatments.  Thus, on October 16, treatment notes indicate that Cole "stated he was 'wigging out' due to methadone [sic] w/d".  (Doc. 73, Ex. I) Notes taken the same day indicate that prison guards who accompanied Cole to his dialysis treatment were attempting to encourage him to work through his withdrawal, and that Cole was informing those around him that he was "coming off" oxycodone, heroin, and methadone.  (Id.)

Wellspan treatment records from October 18, 2008, indicate that Cole's treatments were once again aborted after two hours, pursuant to his insistent demands that treatment be discontinued.  (Id.)  The same notes state that Cole arrived late for his treatment on that day, with Cole representing that "[the] guards forgot I had to come." (Id.)

On October 21, 2008, Wellspan treatment notes reflect that providers were concerned over Cole's elevated potassium levels, and Cole was reminded of the importance of avoiding foods high in potassium and to keep his potassium levels within normal limits.  (Id.)

Cole's final dialysis treatment at Wellspan was on October 25, 2008, and was discontinued in accordance with Cole's demands.  (Id.)  On this date, Wellspan

medical professionals expressed specific concern about Cole's diet at the prison. Specifically, Wellspan medical providers became troubled when they learned that Cole was "repeatedly given peanut butter products for lunch," and accordingly a nurse with Wellspan spoke to a corrections officer to advise him of Cole's nutritional restrictions.[5] (Id.) These documents reflect that a nurse informed a prison guard about her concerns, and provided him with informational materials to take back to the prison regarding Cole's dietary needs after the guard informed the nurse that "there [was] no nutritional person [at the prison] for special diets."  (Id.)

Following this treatment session, Cole's medical condition declined even more rapidly.  Thus, two days later, Cole began a "clinical devolution" while incarcerated at the prison.  (Doc. 73, Exs. A, K, and M)  At 6:40 a.m. on October 27, Cole told Nurse Kimberly Heim that he could not complete his dialysis because he was "wigging out".  (Doc. 73, Ex. B, Nursing Assessment)  At that time he was complaining of a headache and having "fluid on [his] lungs".  (Id.) Defendant Heim observed that Cole had periorbital edema, a blood pressure reading of 230/150 and a

---

[5] Plaintiff's expert has submitted a report in which he explains that peanut butter is typically high in phosphorous, which is toxic to patients with end-stage renal disease.  (Doc. 73, Ex. K, Report of Dr. Robert B. Greifinger, at 4.)

pulse of 96 beats per minute.[6] (Id.) Nurse Heim noted that Cole was short of breath and was wheezing.[7] (Id.) Nurse Heim also commented that Cole had "asked 3 times this shift for separate types of meds." (Id.) In response, Nurse Heim provided Cole with Tylenol. (Id.) She also testified that she thought Cole might be faking or manufacturing his symptoms. (Id. at 86)

At 4:30 p.m. on October 27, 2008, Cole was again brought before Nurse Heim, complaining of shortness of breath, and presenting with a blood pressure of 182/118, which Plaintiff's expert found to be "highly elevated". (Doc. 73, Ex. K, at 4) Cole was returned to his cell. (Id.)

Two hours later, Cole was once again brought to the medical area, complaining that his heart was fluttering and that he was experiencing shortness of breath. (Id., at 5) At this time, Cole's blood pressure had once again spiked and was "severely elevated" at 248/126. (Id.) Following this visit to the medical area, Nurse Heim contacted Dr. Von Kiel to inform him about Cole's shortness of breath. (Doc. 73, Ex. D, Von Kiel Dep., at 42-45) Dr. Von Kiel ordered the administration of oxygen. (Id.) According to Dr. Von Kiel, this is the only instance when Nurse Heim informed him

---

[6] In his report, Dr. Greifinger opined that a blood pressure of 230/140 was "astounding". (Doc. 73, Ex. K, at 4)

[7] Cole's autopsy revealed that he suffered from acute pneumonia. (Doc. 73, Ex. O)

about Cole's shortness of breath or medical concerns on October 27. (Id.) Indeed, Dr. Von Kiel claims that Nurse Heim never informed him about any of Cole's vital signs, and he attested that he would have ordered "close monitoring" of Cole had he been informed about his deteriorating condition. (Id., at 43-45) However, Dr. Von Kiel did not testify that he inquired into Cole's vital signs, and even testified that he may have considered Cole's severely elevated blood pressure to be the product of anxiety and, hence, "not an accurate blood pressure".[8]  (Id.)  Notwithstanding Dr. Von Kiel's authorization for Cole to be provided with oxygen, nobody provided Cole with an oxygen tank until 11:00 p.m. on October 27. (Doc. 73, Ex. C, Deposition of Kimberly Heim, at 84-86)

At 8:00 p.m., Nurse Heim testified that she heard Cole crying out that he was "dying", but she cannot recall whether or not she responded to his cries. (Id., at 81) Three hours later, Cole was once again brought to see Nurse Heim, complaining of shortness of breath, a rapid heart beat, and presenting with high blood pressure. (Id., at 85) Although Nurse Heim attests that she informed Dr. Von Kiel at this time about Cole's condition, (id., at 88), Dr. Von Kiel denies a second contact, (Doc. 73, Ex. D,

_____

[8] During his deposition, Dr. Von Kiel offered his opinion that Cole's complaints that he was "dying" should be taken in context, as they were made by someone that Dr. Von Kiel considered to be "an impending doom syndrome type individual who claimed he was dying from the very first minute I met him." (Doc. 73, Ex. D, Von Kiel Dep. at 45)

13

Von Kiel Dep. at 40-45).  At this time, neither Nurse Heim nor Dr. Von Kiel took steps to provide further treatment or have Cole transported for outside medical attention.  Like Dr. Von Kiel, Nurse Heim attested that she questioned whether Cole's symptoms were real, and thought that Cole might have been intentionally creating them.  (Doc. 73, Ex. C, Heim Dep. at 86)

Around 11:00 p.m., Cole was provided with a "small, mobile oxygen tank," which had a flow rate of 12 liters per minute, and was returned to his cell.  (Id., at 93-95)

The record indicates that despite his repeated medical complaints throughout the day, neither Nurse Heim nor any other medical professional checked on Cole again for nearly three more hours, until 1:45 a.m. when, after Cole was heard becoming louder and yelling for help, Nurse Heim went to his cell and found that Cole had depleted his supply of oxygen.[9]  At this time, Cole was found incontinent, having defecated in his pants.  Additionally, Cole exhibited a gray pallor, was perspiring excessively, and was experiencing difficulty breathing.  Nurse Heim testified that these symptoms indicated that Cole could be having a heart attack, and Cole himself informed the nurse that he was "in bad shape."  (Doc. 73, Ex. C, Heim Dep. at 98)

---

[9] Nurse Heim attested that she was surprised that Cole had depleted the oxygen provided to him, as she believed the tank had a sufficient supply to last until at least 3:00 a.m. (Doc. 73, Ex. C, Heim Dep. at 95)

Nurse Heim and others situated Cole in a "geri chair," or a lounge chair with wheels, and transported him to medical.  (<u>Id.</u>, at 98-99)  At this time, Cole began to expel a frothy or foamy blood from his nose and mouth, which Nurse Heim also recognized as "a [possible] sign of cardiac failure."  (<u>Id.</u> at 100)

By this point, Cole could no longer speak, was not breathing, had a pulse of 39 beats per minute, and had lapsed into unconsciousness.  (<u>Id.</u>, at 101)  Nurse Heim and other staff members attempted to insert an air tube and an IV unit, but had limited success, and Cole remained unable to breath on his own.  At approximately 2:20 a.m., an ambulance left to take Cole to a hospital.  (<u>Id.</u>, at 105)  Nurse Heim attested that she believes she or another staff member called Dr. Von Kiel after this time to tell him what had happened, but she cannot recall details of this call, or whether Dr. Von Kiel responded in any way.  (<u>Id.</u>, at 105-06)

At 3:00 a.m., officials at York Hospital called the prison to notify them that they had resuscitated Cole, but that he remained in critical condition.  (<u>Id.</u>, at 106)  Cole died in the hospital one week later.

## III.   <u>STANDARD OF REVIEW</u>

Defendants have moved for summary judgment on all of Plaintiff's remaining claims, pursuant to Rule 56 of the Federal Rules of Civil Procedure.  Federal courts are permitted to summarily adjudicate an action in order to dispose of those claims

that do not present a "genuine issue as to any material fact," Fed. R. Civ. P. 56, and

for which a jury trial would therefore "be an empty and unnecessary formality,"

Peynado v. Sabol, No. 09-355, 2010 U.S. Dist. LEXIS 134131, 2010 WL 5300563,

at *2 (M.D. Pa. Dec. 20, 2010). Rule 56 specifically provides that "[t]he judgment

sought should be rendered if the pleadings, the discovery and disclosure materials on

file, and any affidavits show that there is no genuine issue as to any material fact and

that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). The

substantive law identifies which facts are material, and "[o]nly disputes over facts that

might affect the outcome of the suit under the governing law will properly preclude

the entry of summary judgment." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248

(1986). A dispute about a material fact is genuine only if there is a sufficient

evidentiary basis that would allow a reasonable fact finder to return a verdict for the

non-moving party. Id. at 248-49.

The moving party has the initial burden of identifying evidence that it believes

shows an absence of a genuine issue of material fact. Conoshenti v. Pub. Serv. Elec.

& Gas Co., 364 F.3d 135, 145-46 (3d Cir. 2004). Once the moving party has shown

that there is an absence of evidence to support the nonmoving party's claims, "the

non-moving party must rebut the motion with facts in the record and cannot rest solely

on assertions made in the pleadings, legal memoranda, or oral argument." Berckeley

Inv. Group. Ltd. v. Colkitt, 455 F.3d 195, 201 (3d Cir. 2006); accord Celotex Corp. v. Catrett, 477 U.S. 317, 324 (1986).  If the nonmoving party "fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden at trial," summary judgment is appropriate. Celotex, 477 U.S. at 322.  Summary judgment is also appropriate if the non-moving party provides merely colorable, conclusory, or speculative evidence.  Anderson, 477 U.S. at 249.   There must be more than a scintilla of evidence supporting the nonmoving party and more than some metaphysical doubt as to the material facts.  Id. at 252; see also Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986).  In making this determination, the Court must "consider all evidence in the light most favorable to the party opposing the motion."  A.W. v. Jersey City Pub. Schs., 486 F.3d 791, 794 (3d Cir. 2007).

## IV.   DISCUSSION

Plaintiff has brought distinct claims against the Medical Defendants and the York County Prison Board, and these parties have accordingly moved separately for summary judgment, and have offered different arguments in support of their motions. We will address the motions separately below.

## A.      York County Prison Board

Plaintiff has alleged that the York County Prison Board violated Cole's rights under Title II of the ADA, specifically by maintaining and adhering to a policy that prevents inmates suffering from opiate addiction from receiving the therapeutic benefits of methadone treatment during their incarceration.  (Doc. 1, Compl, Count V; Doc. 69, at 3)

Title II of the ADA prohibits disability discrimination in the provision of public services, and provides that "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity."  42 U.S.C. § 12132.  The regulations applicable to Title II of the ADA provide that the statute's coverage reaches "all services, programs, and activities provided or made available by public entities."  28 C.F.R. § 35.102(a); see also Yeskey v. Pennsylvania Dep't of Corrections, 118 F.3d 168, 171 (3d Cir. 1997) ("This broad language is intended to 'apply to anything a public entity does.'") (quoting 28 C.F.R. § 35.102(a) pt. 35, app. A, subpt. A at 456).  Accordingly, Title II of the ADA applies to public entities such as state and local prisons.  See Pennsylvania Dep't of Corrections v. Yeskey, 524 U.S. 206, 209-10 (1998); see also United States v. Georgia, 546 U.S. 151, 157 (2006) (services, programs or activities for purposes of

Title II of the ADA include recreational, medical, educational, and vocational prison programs).  The Supreme Court has found that "it is quite plausible that the alleged deliberate refusal of prison officials to accommodate [an inmate's] disability-related needs in such fundamentals as mobility, hygiene, medical care, and virtually all other prison programs constituted 'exclu[sion] from participation in or . . . deni[al of] the benefits of' the prison's 'services, programs, or activities." Id. (quoting 42 U.S.C. § 12132).

Additionally, applicable regulations require public entities, such as county prisons, to "make reasonable modifications in policies, practices, or procedures when the modifications are necessary to avoid discrimination on the basis of disability, unless the public entity can demonstrate that making the modifications would fundamentally alter the nature of the service, program, or activity."  28 C.F.R. § 35.130(b)(7).  Pursuant to this statutory mandate, prisons are required to provide "safe involuntary commitment" as a "service" to inmates under Title II.  Heckenswiler v. Chief McLaughlin, 517 F. Supp. 2d 707, 717-18 (E.D. Pa. 2007).

In order to prevail on a claim under Title II of the ADA, a plaintiff must prove that (1) he is a qualified individual (2) with a disability, and (3) he was excluded from participation in or denied the benefits of the services, programs, or activities of a public entity, or was subjected to discrimination by any such entity, (4) by reason of

his disability.  <u>Bowers v. Nat'l Athletic Collegiate Athletics Ass'n</u>, 475 F.3d 524, 553

n.32 (3d Cir. 2007); <u>see also</u> <u>Wagner v. Fair Acres Geriatric Center</u>, 49 F.3d 1002,

1009 (3d Cir. 1995).

In its motion for summary judgment, the York County Prison Board argues that

there is no evidence to show that non-medical officials at the York County Prison

knew of or intended any violation of Cole's rights under the ADA.  In support of this

argument, the Prison Board maintains that decisions regarding Cole's medical care,

including the policy to prevent inmates from continuing with methadone treatments,

were made exclusively by PrimeCare Medical and its employees.  (Doc. 55, at 4;  Doc.

56, Exs. 4A and 4B, PrimeCare Medical Guidelines on Use of Methadone)

Additionally, the Prison Board maintains that it cannot be liable for violating

Cole's rights under the ADA because neither Cole nor his family ever made a "formal

request for accommodation", because the "need for accommodation was not apparent

to the non-medical prison staff and the York County Prison Board." (<u>Id.</u>, at 9)  Thus,

the Prison Board does not contest Plaintiff's claims that denial of methadone, or other

treatment, had an adverse effect upon Cole's ability to comply with his dialysis

treatment while he was incarcerated, but instead argues that PrimeCare was

exclusively charged with making all medical decisions within the York County Prison

pursuant to a contract.  (Doc. 56, Ex. 2, Deposition of Clare Doll, at 14) (attesting that

the policies and guidelines of PrimeCare Medical are not reviewed by the prison, and the clinical treatment of drug addicted inmates is delegated to PrimeCare Medical).

In response, Plaintiff points to evidence in the record that could show that contrary to the Prison Board's assertion, the Prison Board played a critical role in promulgating and maintaining PrimeCare Medical's written policy of prohibiting inmates from continuing methadone treatments. In this regard, Dr. Erik Von Kiel testified that at each prison in which PrimeCare operated, the methadone policy reached is the result of a joint decision between PrimeCare and the prison, with the prison having the "last word" on the matter.[10] (Doc. 69, Ex. D, Von Kiel Dep. at 12-20) Thus, there is a factual dispute in this case over the Prison Board's responsibility for the policy that prevented Troy Cole from continuing methadone treatments during his incarceration.[11]

---

[10] Indeed, at one point, the Prison Board seems to acknowledge that it had some role in adhering to the policy: "The policy was followed in the York County Prison but it was a medical guideline of PrimeCare." (Doc. 55, at 10)

[11] In addition to this disputed issue of fact, the Court notes that the Prison Board has not pointed to any statute or regulation that would permit the prison to delegate to a third-party contractor the board's obligations under Title II with respect to ensuring that inmates are not excluded from any program or benefit on the basis of their disabilities. The Court has not identified any statute or case law that would support the Prison Board's apparent argument that it can disclaim liability under Title II of the ADA by virtue of its contract with a third-party medical provider. Accordingly, we do not find that this unsupported assertion regarding delegation represents a legitimate basis to award summary judgment in

We also find unpersuasive the Prison Board's argument that Plaintiff's claims under the ADA are absolutely foreclosed because Troy Cole and his family failed to properly notify prison officials about his medical complaints, including his inability to complete dialysis treatments due to his withdrawal symptoms that were exacerbated by his inability to continue with methadone treatment.  Plaintiff testified during her deposition that she made several attempts to contact the prison's warden about Cole's medical care and his lack of methadone treatment, but that she was consistently referred to the medical unit, and thereby prevented from communicating with the warden or any other prison officials, in order to make them specifically aware of her concerns.  We agree with Plaintiff that Defendants cannot claim ignorance about Plaintiff's claims if they persistently refused to communicate with her about her concerns when she called.

However, we nevertheless find that the Prison Board is entitled to summary judgment on Plaintiff's claims that the prison's policy of denying inmates methadone treatment constituted a violation of Title II of the ADA, because Plaintiff's claims of discrimination lack factual support.

As a threshold matter, we note that a plaintiff fails to state a claim under the ADA where the inmate-plaintiff simply alleges that he was denied medical care, or

---

the Prison Board's favor.

was provided inadequate medical treatment.  <u>See, e.g.</u>, <u>Iseley v. Beard</u>, 200 F. App'x 137, 142 (3d Cir. 2006); <u>Fitzgerald v. Corr. Corp. of Am.</u>, 403 F.3d 1134, 1144 (10th Cir. 2005) ("[P]urely medical decisions . . . do not ordinarily fall within the scope of the ADA or the Rehabilitation Act."); <u>Bryant v. Madigan</u>, 84 F.3d 246, 249 (7th Cir. 1996) (holding that "the [ADA] would not be violated by a prison's simply failing to attend to the medical needs of its disabled prisoners . . . [t]he ADA does not create a remedy for medical malpractice."); <u>see also</u> <u>Lesley v. Chie</u>, 250 F.3d 47, 55 (1s Cir. 2001) ("[A] plaintiff's showing of medical unreasonableness must be framed within some larger theory of disability discrimination.").  Indeed, in this case, Plaintiff was not denied any necessary medical care; it is undisputed that Cole was given regular dialysis treatments during his custody, and Plaintiff has not presented evidence to show that Cole required methadone.

Perhaps in recognition of this undisputed fact, and this limitation on ADA claims, Plaintiff has attempted to claim that the prison's policy of disallowing inmates to continue with methadone treatments is somehow discriminatory, and that in Cole's case, the policy impaired his ability to complete and obtain the benefits of dialysis treatment.  Thus, Plaintiff does not deny that Cole was provided dialysis treatment, but she claims that a discriminatory policy of prohibiting the use of methadone somehow prevented Cole from completing dialysis.

Even assuming that such a theory of discrimination might, in some cases, have merit, in this case we find that Plaintiff's claim lacks evidentiary support. First, although the parties seem to agree that Cole was a "qualified individual" under the ADA by virtue of his efforts to recover from addiction to opiates, we have serious questions about whether Cole would actually be deemed a qualified individual under the law.

Drug addiction that substantially limits one or more major life activities is a recognized disability under the ADA. 28 C.F.R. § 35.104(1)(ii) ("The phrase physical or mental impairment includes . . . drug addiction . . . ."). However, the term "qualified individual with a disability" does not include an individual who is currently engaging in the illegal use of drugs. 28 C.F.R. § 35.104(5)(iii). A person is "not considered 'qualified' under the [ADA] if [he has] used illegal drugs 'recently enough so that continuing use is a real ongoing problem.'" New Directions Treatment Servs. v. City of Reading, 490, F.3d 293, 309 (3d Cir. 2007) (quoting Brown v. Lucky Stores, Inc., 246 F.3d 1182, 1188 (9th Cir. 2001)). In surveying case law relevant to this issue, the Third Circuit observed that "[m]ere participation in a rehabilitation program is not enough [to qualify]," and that covered entities "are entitled to seek reasonable assurances that no illegal use of drugs is occurring." Id. at 309 (quoting Brown, 246 F.3d at 1188). The Third Circuit has thus indicated that courts should

give close consideration to whether an individual's drug use presents a "real ongoing problem" when determining whether that individual qualified under the ADA. Id. at 310 (quoting Brown, 246 F.3d at 1188).  In this case, although Cole's mother testified that she believed Cole had been undergoing methadone treatment for three months before his arrest, the record shows that Cole admitted to prison officials that he has used three bags of heroin just two days before he was taken into custody.  (Doc. 73, Ex. G, Medical Intake Form)  This fact alone gives rise to a serious question of whether Cole even qualified under the ADA.

Even if we concede that there may be issues of fact as to whether Cole was a qualified individual under the ADA notwithstanding his admittedly current drug abuse upon his arrival, we nevertheless find that Plaintiff has failed to adduce sufficient evidence to support her theory of disability discrimination, or her claim that the prison's policy of prohibiting inmates from undergoing methadone treatment caused or contributed to Cole's failure to complete his dialysis treatments.

We note first that Plaintiff has not supported her theory of disability discrimination in this case with citation to relevant authority, and we have not found any cases holding that a prison's policy of prohibiting inmates from using methadone constitutes actual, intentional discrimination.  The record indicates that no inmates, other than pregnant inmates, were permitted to use methadone while incarcerated.  We

also find no evidence even to suggest that the policy was intentionally discriminatory, whether against opiate addicts or any other ostensible class of inmates.

Furthermore, review of the record reveals nearly a total lack of evidence in support of Plaintiff's underlying claim that her son's inability to continue with methadone treatment caused or contributed to his failure to complete dialysis treatment while in custody.  Indeed, the only evidence in support of Plaintiff's claims appears to be: (1) that Cole himself informed a Wellspan nurse, during a single dialysis session, that he was experiencing withdrawal symptoms from being off of heroin, oxycodone, and methadone (Doc. 73, Ex. I); and (2) that Plaintiff herself believed that Cole's lack of access to methadone was adversely affecting his ability to dialyze properly (Doc. 73, Ex. R, McKissick Dep. at 33-37).  In stark contrast to this unsupported lay testimony, neither of Plaintiff's medical experts opined that the discontinuation of Cole's methadone treatment had an adverse effect upon his dialysis treatments.  Instead, Dr. Carl Goldstein stated in his expert report that Cole's dialysis was impaired by his uncontrolled hypertension, and his persistent hyperkalemia, and Dr. Robert Greifinger similarly did not opine that Cole's lack of methadone had any impact on his dialysis treatment.  (Doc. 73, Ex. M, Report of Carl S. Goldstein, M.D., at 4; Ex. K, Report of Robert B. Greifinger, M.D.)

In sum, we find that Plaintiff has failed to come forward with evidence in support of her claims that the York County Prison Board's adherence to a policy that prohibits inmates from utilizing methadone treatment was discriminatory in nature, and we further find insufficient evidence in the record that Plaintiff's lack of access to methadone contributed to his inability to complete dialysis treatments while in custody.  Instead, the evidence taken in the light most favorable to Plaintiff, shows only that Cole had considerable difficulty completing dialysis treatments in October 2007, and that his uncontrolled high blood pressure and persistent high potassium levels were the critical contributing factors to this problem.  Accordingly, finding an absence of evidence to support Plaintiff's claim, we conclude that the Prison Board is entitled to summary judgment on Plaintiff's claim for alleged violations of Title II of the ADA.

### B.    The Medical Defendants

Plaintiff has brought claims against PrimeCare Medical, Dr. Eric Von Kiel, and Nurse Kimberly Heim (the "Medical Defendants") pursuant to 42 U.S.C. § 1983, alleging violations of Troy Cole's rights under the Eighth and Fourteenth Amendments to the United States Constitution on the grounds that these defendants were deliberately indifferent to his serious medical needs while he was incarcerated

at York County Prison in October 2008.  Plaintiff has also brought claims against the Medical Defendants for negligence under Pennsylvania state law.

PrimeCare, Dr. Von Kiel, and Nurse Heim have moved for summary judgment on Plaintiff's claims, arguing that Plaintiff has failed to show that the medical treatment he received was so deficient as to give rise to constitutional violations, but was at most negligence, which is not actionable under the Eighth or Fourteenth Amendments.  The Medical Defendants also argue that Plaintiff has failed to come forward with evidence to show that PrimeCare Medical maintained policies that caused the alleged constitutional violations.  Accordingly, PrimeCare Medical asserts that the company is entitled to summary judgment because it cannot be held liable under a theory of supervisory liability or *respondeat superior*.  Lastly, the Medical Defendants urge the Court to dismiss Plaintiff's state-law claims to the extent the Court grants summary judgment in the defendants' favor with respect to the constitutional claims alleged.

Upon due consideration, the Medical Defendants' motion for summary judgment will be denied.

### 1.    42 U.S.C. § 1983

The text of 42 U.S.C. § 1983 provides as follows:

> Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any person of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress .
> . . .

42 U.S.C. § 1983.  Section 1983 is not itself a source of substantive rights, but is rather a vehicle that plaintiffs may use in order to seek redress against state actors for alleged violations of rights under the Constitution or other federal law, including under the Eighth Amendment to the United States Constitution. City of Oklahoma City v. Tuttle, 471 U.S. 808, 816 (1985); Kneipp v. Tedder, 95 F.3d 1199, 1204 (3d Cir. 1996).

### 2.    Deliberate Indifference Under the Eighth Amendment

The Eighth Amendment provides that "[e]xcessive bail shall not be required, nor excessive fines imposed, nor cruel and unusual punishments inflicted."  With respect to prisoner confinement, the Eighth Amendment obligates the government "to provide medical care for those whom it is punishing by incarceration." Estelle v. Gamble, 429 U.S. 97, 103 (1976); see also Farmer v. Brennan, 511 U.S. 825, 832-33

(1994); Reynolds v. Wagner, 128 F.3d 166, 172-73 (3d Cir. 1997).  "An inmate must rely on prison authorities to treat his medical needs; if the authorities fail to do so, those needs will not be met.  In the worst cases, such a failure may actually produce physical torture or a lingering death."  Estelle, 429 U.S. at 103 (quoting In re Kemmler, 136 U.S. 436, 447 (1890)).

In Estelle, the United States Supreme Court held that prison officials violate the Eighth Amendment's proscription of cruel and unusual punishment when they exhibit "deliberate indifference to serious medical needs of prisoners."  429 U.S. at 104.  The standard that Estelle established "requires [both that there be] deliberate indifference on the part of the prison officials and [that] the prisoner's medical needs . . . be serious."  Monmouth County Correctional Inst. Inmates v. Lanzaro, 834 F.2d 326, 346 (3d Cir. 1987) (quoting West v. Keve, 571 F.2d 158, 161 (3d Cir. 1978)).  Under this two-prong test, an inmate must first objectively establish a deprivation of medical care, or the result of such deprivation, the result of which was sufficiently serious to implicate a constitutional violation.  Montgomery v. Pinchak, 294 F.3d 492, 499 (3d Cir. 2002) (citing Wilson v. Seiter, 501 U.S. 294, 298 (1991)).  An inmate's medical need is serious under this standard when it "has been diagnosed by a physician as requiring treatment or . . . is so obvious that a lay person would easily recognize the necessity for a doctor's attention."  Monmouth County Corr. Institutional Inmates v.

30

Lanzaro, 834 F.2d 326, 347 (3d Cir. 1987) (citations and internal quotations omitted).

Secondly, the inmate-plaintiff must show that prison officials subjectively knew of the

deprivation and "disregard[ed] an excessive risk to [the] inmate['s] health or safety."

Natale v. Camden County Corr. Facility, 318 F.3d 575, 582 (3d Cir. 2003).

Thus, in the medical context, a constitutional violation under the Eighth

Amendment occurs only when state officials are deliberately indifferent to an inmate's

serious medical needs. Estelle, 429 U.S. at 105.  To establish a violation of Cole's

constitutional right to adequate medical care in accordance with this standard, Plaintiff

is thus required to point to evidence that demonstrates (1) a serious medical need, and

(2) acts or omissions by prison officials that indicate deliberate indifference to that

need.  Rouse v. Plantier, 182 F.3d 192, 197 (3d Cir. 1999); see also Woloszyn v.

County of Lawrence, 396 F.3d 314, 321 (3d Cir. 2005) (for a claim of deliberate

indifference against a prison official to survive, "the official must both be aware of

facts from which the inference could be drawn that a substantial risk of serious harm

exists, and he must also draw the inference.").  The Third Circuit has found deliberate

indifference where a prison official: "(1) knows of a prisoner's need for medical

treatment but intentionally refuses to provide it; (2) delays necessary medical

treatment based on a non-medical reason; or (3) prevents a prisoner from receiving

needed or recommended medical treatment." Rouse, 182 F.3d at 197. The Third

Circuit has also held that "[n]eedless suffering resulting from the denial of simple medical care, which does not serve any penological purpose, . . . violates the Eighth Amendment." Atkinson v. Taylor, 316 F.3d 257, 266 (3d Cir. 2003).

In summary, deliberate indifference to a serious medical need involves the "unnecessary and wanton infliction of pain." Estelle, 429 U.S. at 104. Such indifference may be evidenced by an intentional refusal to provide care, delayed provision of medical treatment for non-medical reasons, denial of prescribed medical treatment, denial of reasonable requests for treatment that results in suffering or risk of injury, Durmer v. O'Carroll, 991 F.2d 64, 68 (3d Cir. 1993), or "persistent conduct in the face of resultant pain and risk of permanent injury," White v. Napoleon, 897 F.2d 103, 109 (3d Cir. 1990). The Third Circuit has held that prison officials act with deliberate indifference when (1) reasonable requests for medical treatment are denied, exposing the inmate to undue suffering or the threat of further injury; (2) necessary medical treatment is delayed for non-medical reasons; (3) arbitrary or burdensome procedures are erected to create treatment delays to suffering prisoners; and (4) inmates are prevented from receiving access and treatment from capable medical professionals. See Lanzaro, 834 F.2d at 346-47.

At the same time, it is also clear that the mere misdiagnosis of a condition or medical need, or negligent treatment provided for a condition, is not actionable as an

Eighth Amendment claim because medical malpractice is not a constitutional violation. See Spruill v. Gillis, 372 F.3d 218, 235 (3d Cir. 2004); Singletary v. Pa. Dep't of Corr., 266 F.3d 186, 192 n.2 (3d Cir. 2002) (claims of medical malpractice, absent evidence of a culpable state of mind, do not constitute deliberate indifference under the Eighth Amendment).   Instead, deliberate indifferent represents a much higher standard, one that requires "obduracy and wantonness, which has been likened to conduct that includes recklessness or a conscious disregard of a serious risk." Rouse, 182 F.3d at 197 (quoting Whitley v. Albers, 475 U.S. 312, 319 (1986)).

With the foregoing legal guidelines in mind, we find that Plaintiff's claims survive the Medical Defendants' motion for summary judgment, and must proceed to trial.   Indeed, the defendants do little more than offer an overview of the legal principles governing claims for deliberate indifference before asserting that "the medical evidence borne out in discovery precludes a finding of deliberate indifference as a matter of law . . . ."  (Doc. 59, at 7-8)  To the contrary, our review of the record leads us to conclude that "the medical evidence borne out in discovery" gives rise to questions of fact as to whether Dr. Von Kiel and Nurse Heim were deliberately indifferent to Troy Cole's serious medical needs during his incarceration, and particularly on October 27, 2008, a day during which Cole's health appears to have precipitously declined.  As discussed above, the evidence seems to be uncontroverted

that on that day, Troy Cole complained regularly, and with increasing urgency, about experiencing withdrawal symptoms; shortness of breath; and blood pressure readings found by outside experts to be elevated even to the point of being "astounding".

The record also contains evidence that could show that despite being notified that Cole required a low-sodium renal diet, Dr. Von Kiel did nothing to ensure either that Cole was placed on such a diet, or even to notify prison officials that multiple medical professionals had emphasized Cole's need for such a diet.  (See generally Doc. 73, Exs. A, D, K, and N)

Additionally, Plaintiff has identified evidence showing that on October 27, 2008 – a day marked by Cole's rapid physical decline, leading to what would prove to be a fatal heart attack in the early hours of October 28 – Nurse Heim and Dr. Von Kiel failed to communicate with one another meaningfully or adequately in response to alarming signs that Cole's condition was dramatically worsening.  The same evidence also could support a finding that these Defendants failed to take sufficient or more than de minimis steps to address Cole's progressively declining condition throughout October 27.

Thus, Plaintiff points to evidence showing that as Cole's condition worsened, Nurse Heim delayed or failed to respond timely to Cole's complaints, and that she failed to notify Dr. Von Kiel about Cole's vital signs.  There is also a factual dispute

between the testimony of Nurse Heim and Dr. Von Kiel, as Nurse Heim has attested that she believes she notified Dr. Von Kiel regularly about Cole's condition on October 27, whereas Dr. Von Kiel testified during his deposition that he was only called one time.  At the same time, the record appears to be devoid of evidence to show that Dr. Von Kiel inquired into, or followed up on, Cole's vital signs and condition – only offering that if he had been informed, he would have directed "close monitoring" of Cole.  (Doc. 73, Ex. D, Von Kiel Dep. at 43-45)

Importantly for purposes of Plaintiff's Eighth Amendment claim against these defendants, the record also contains evidence that these alleged failings on the part of Dr. Von Kiel and Nurse Heim were not merely the product of negligence, but may have reflected deliberate indifference.  Thus, Plaintiff has identified evidence showing that Dr. Von Kiel considered Cole to be "an impending doom type individual," and that he may have discounted his complaints accordingly, or concluded that Cole was manufacturing his elevated vital signs such as blood pressure and potassium levels. For her part, Nurse Heim testified that she believed Cole may simply have been faking his inability to breathe in order to obtain medication from her when she first began responding to his complaints at 6:40 a.m. on October 27, and there is evidence that could permit a factfinder to infer that Nurse Heim's opinion about Troy Cole caused

her to discount or ignore Cole's repeated pleas throughout that day, even though objective indicators suggested his condition was becoming increasingly dire.[12]

In short, we agree with Plaintiff that there is sufficient evidence in the record to permit Plaintiff's claims to proceed to trial.  There is no question that Troy Cole had very serious medical needs, and we find that the parties have developed evidence that could support Plaintiff's claim that Defendants Von Kiel and Heim were not only negligent in their provision of care to Cole, but that they were deliberately indifferent to his needs at a critical period – a period that ultimately ended with Cole suffering what would prove to be a fatal heart attack.  Given the factual record presented, the Medical Defendants' motion for summary judgment on behalf of Dr. Von Kiel and Nurse Heim will be denied.

### 3.    Plaintiff's Claims Against PrimeCare Medical

---

[12]  We emphasize that in presenting this version of the evidence, we are simply indicating that there is evidence in the record that would permit such a finding; we are not suggesting that this version of the evidence represents what actually occurred on October 27.  We recognize that this case is a matter of great importance, not only to Plaintiff, but also to the individuals named as defendants in a lawsuit where a man ultimately died and where the individual medical defendants are being blamed for causing or contributing to his death.  We therefore wish to emphasize that we are not expressing a conclusion as to what the evidence actually proves.  On summary judgment, we are enjoined to consider the evidence in the light most favorable to Plaintiff as the non-moving party, and to resolve factual disputes in Plaintiff's favor.

In addition to bringing suit against Dr. Von Kiel and Kimberly Heim, RN, Plaintiff has also sued PrimeCare Medical for violations of the Eighth and Fourteenth Amendments, alleging that the violations of Cole's rights "occurred as a result of the practices, policies and procedures of PrimeCare." (Doc. 1, Compl., Count II, ¶ 64) PrimeCare Medical was contracted with the York County Prison to provide medical services to inmates. Plaintiff claims that the allegedly deficient practices, policies, and procedures included: (1) failure to train medical staff to evaluate and treat health conditions, including end-stage renal disease and substitution therapy for opiate addiction; (2) failure to promulgate or implement procedures for timely and adequately evaluating an inmate's health conditions; (3) endorsing and accepting PrimeCare's "long-standing pattern and practice of failing to provide prompt and adequate evaluations of inmates and their needs"; (4) failure to have policies for the prompt and adequate treatment of life-threatening conditions; (5) failure to implement procedures for evaluating inmates' need for methadone treatment for opiate addiction; (6) failure to provide medical professionals qualified to respond to medical emergencies and serious medical needs; and (7) failure to implement policies for maintaining and monitoring medical equipment, including oxygen tanks. (Id., ¶ 65(a)-(f))

A private corporation that has contracted with the state to provide services cannot be subjected to liability under § 1983 on the basis of *respondeat superior*. See Natale, 318 F.3d at 583-84; see also Monell v. Dep't of Soc. Servs., 436 U.S. 658, 691-94 (1978) (holding that a municipality cannot be liable under § 1983 on a theory of *respondeat superior*). Instead, in order to hold a private corporation liable under § 1983, a plaintiff must prove that he suffered a constitutional deprivation as a result of an official corporate policy or custom. Natale, 318 F.3d at 583-84 (applying Monell to PHS); see also Bd. of the County Comm'rs v. Brown, 520 U.S. 397, 404 (1997); Griggs v. Dauphin County Prison, No. 1:06-0823; 2008 WL 2518090, at *4 (M.D. Pa. June 19, 2008); Miller v. City of Phila., No. 96-3578, 1996 U.S. Dist. LEXIS 17514, 1996 WL 683827, at *4 (E.D. Pa. Nov. 26, 1996) (in order to establish liability for a private corporation, a plaintiff must show that the corporation, "with 'deliberate indifference to the consequences, established and maintained a policy, practice or custom which directly caused [plaintiff's] constitutional harm.'") (quoting Stoneking v. Bradford Area Sch. Dist., 882 F.2d 720, 725 (3d Cir. 1989)). As the Third Circuit has explained, a

> policy or custom can be established in two ways. Policy is made when a "decisionmaker possessing final authority to establish municipal policy with respect to the action" issues an official proclamation, policy, or edict. A course of conduct is considered to be a "custom" when, though not

> authorized by law, "such practices of state officials [are] so
> permanent and well-settled" as to virtually constitute law.

Beck v. City of Pittsburgh, 89 F.3d 966, 971 (3d Cir. 1996) (quoting Andrews v. City

of Philadelphia, 895 F.2d 1469, 1480 (3d Cir. 1990)).   Custom may also be

established by evidence that demonstrates knowledge or acquiescence.  Beck, 89 F.3d

at 971 (citing Fletcher v. O'Donnell, 867 F.2d 791, 793 (3d Cir. 1989)).

This institutional liability may also be based upon a failure-to-train staff,

however, the need for training, supervision, or other corrective action to avoid

imminent deprivations of a constitutional right "must be so apparent that any

reasonable policymaker or supervisor would have taken appropriate preventive

measures." Horton v. City of Harrisburg, No. 06-2338, 2009 U.S. Dist. LEXIS 63428,

*13 (M.D. Pa. July 23, 2009) (quoting Strauss v. Walsh, No. Civ. A. 01-3625, 2002

U.S. Dist. LEXIS 24717, 2002 WL 32341791, at *3 (E.D. Pa. Dec. 17, 2002)).

Additionally, in order to recover on a failure-to-train theory, the alleged failure must

be "closely related to the ultimate (constitutional) injury."  Woloszyn, 396 F.3d at

325.

Upon consideration, we find that there exist numerous unresolved issues of

material fact that bear upon Plaintiff's claims that PrimeCare Medical maintained

policies or customs that were responsible for the allegedly inadequate treatment and

deliberate indifference he received at the prison.   In this regard, we agree with

Plaintiff that PrimeCare Medical's mere reference to its "Medical Diets Policy", (Doc. 60, Ex. X, Policy - Nutrition & Medical Diets), is insufficient to demonstrate that the company's policies were sufficient.  Regardless of what the policy provides, there is evidence in the record showing that Cole had a need for a particular diet to address his end-stage renal disease and hypertension, and the facts suggest that neither Dr. Von Kiel nor any other medical professional took any affirmative steps to ensure that such diet was provided, or that PrimeCare's own written policy was enforced.

Similarly, although PrimeCare Medical has provided written policies providing for review and communication among its medical professionals, the record lacks evidence to show that PrimeCare had procedures in place to ensure that these policies were implemented and followed.  The conflicting testimony of Dr. Von Kiel and Nurse Heim about their communication, or lack thereof, on October 27, 2008, alone is probative evidence about whether PrimeCare's policies were enforced. The manifest confusion, and contradictions, between Heim and Von Kiel also highlight an apparent lack of training on these communications policies, a lack of training which may have had fatal consequences here for Cole.

Additionally, Plaintiff has argued that PrimeCare has at no time produced any written policy governing how its professionals are to respond to emergency medical conditions, and Plaintiff contends that her son's treatment throughout his

incarceration, and on October 27, 2008, in particular, confirms an absence of a policy to ensure that emergency medical decisions were made appropriately and not "in an ad hoc, helter-skelter manner."  (Doc. 73, at 10)  Thus, on the present record, we are confronted with what is an unrebutted claim that PrimeCare, the health care provider at this prison, apparently had no emergency response protocols in place when this medical emergency arose.

The Third Circuit has noted that in some cases "the failure to establish a policy to address the immediate medication needs of inmates with serious medical conditions creates a risk that is sufficiently obvious to constitute deliberate indifference to those inmates' medical needs." Natale, 318 F.3d at 585.  Upon review of the record in this case, we find this instruction in Natale to be applicable, and compels a finding that summary judgment is inappropriate on PrimeCare's claim that Plaintiff has failed to come forward with evidence to support her claims against the company under 42 U.S.C. § 1983.

### 4.     Supplemental State-Law Claims

Finally, the Medical Defendants have argued that Plaintiff's supplemental state-law claims should be dismissed in the event the Court grants summary judgment in the Medical Defendants' favor on Plaintiff's federal claims.  Since we will deny the Medical Defendants' motion for summary judgment with respect to Plaintiff's federal

claims, and because the Medical Defendants have offered no other basis for granting summary judgment in their favor with respect to Plaintiff's state-law claims, these claims will be permitted to go forward at trial.

## V.   **ORDER**

Accordingly, for the reasons set forth above, IT IS HEREBY ORDERED THAT:

1.   The York County Prison Board's motion for summary judgment (Doc. 54) is GRANTED.

2.   The Medical Defendants' motion for summary judgment (Doc. 58) is DENIED.

3.   Plaintiff's claims against Defendants Michelle Murphy, B. Hamrick, Michelle Rau, and Todd Haskins are DISMISSED.

4.      The Clerk of Court shall refrain from entering judgment in favor of any party until the conclusion of this action or further order of the Court.


                                        _/s/ Martin C. Carlson_____
                                        Martin C. Carlson
                                        United States Magistrate Judge

Dated:      October 25, 2011